Filed 3/28/23  Titlemax of California v. Pena CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TITLEMAX OF CALIFORNIA,<br><br>Petitioner and Appellant,<br><br>v.<br><br>CARLOS PEÑA,<br><br>Respondent;<br><br>DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF LABOR STANDARDS ENFORCEMENT,<br><br>Intervener and Respondent. | F084706<br><br>(Super. Ct. No. 21CECG03730)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Baker & Hostetler, Shareef S. Farag and Vartan S. Madoyan, for Petitioner and Appellant.

No appearance for Respondent.

Scott R. Jones and Patrick C. McManaman for Intervener and Respondent.

-ooOoo-

**INTRODUCTION**

Petitioner and appellant TitleMax of California, Inc. (TitleMax) appeals from two orders: (1) an order (sometimes referred to as the "subject order") denying its petition to compel arbitration of a wage dispute between it and its former employee, respondent Carlos Peña; and (2) an order denying its ex parte application to stay proceedings before the Division of Labor Standards Enforcement (sometimes referred to as the "ex parte order"). (TitleMax and Peña are referred to, collectively, as the "parties.") The Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) is the respondent in intervention. (TitleMax and DLSE are sometimes referred to, collectively, as the "litigants.")

We reverse the subject order and ex parte order and remand the case to the trial court to enter an order compelling arbitration of Peña's claims and staying the DLSE proceedings pending completion of the arbitration.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Peña's Employment By TitleMax and Agreement to Arbitrate Certain Claims**

Peña was employed by TitleMax or its affiliates from approximately May 2014 until his resignation in July 2018. On May 12, 2014, at or near the commencement of Peña's employment with TitleMax's affiliate, TitleMax of Nevada, Inc., Peña and his then employer entered into a standalone, multi-page arbitration agreement (arbitration agreement). The arbitration agreement bound Peña and affiliates of TitleMax of Nevada, Inc. to its provisions. Neither Peña nor TitleMax dispute the validity of the arbitration agreement or that each is subject to its terms. Among other things, the arbitration agreement provided:

> "The Federal Arbitration Act (9 U.S.C. §§ 1–16) ('FAA') shall govern this Agreement. If for any reason the FAA does not apply, then state law of arbitrability where Employee works for the Employing Company (or, if Employee is no longer employed by the Employing Company, last worked for the Employing Company) shall apply."

2.

The arbitration agreement goes on to describe claims that are covered by the agreement. Those provisions read, in relevant part:

"The Parties mutually consent to the resolution by arbitration of all Arbitrable Claims (as defined below), past, present, or future, that Employee may have against any of the following: (1) TitleMax of Nevada, Inc. (the "Employing Company"), (2) any and all parents, subsidiaries, affiliates, and/or any other related companies of the Employing Company (collectively, the 'Affiliated Companies'), (3) any and all officers, directors, members, managers, owners, shareholders, employees, agents, or any other representatives of any entity referenced in subsections (1) or (2) above (in their capacity as such or otherwise), … or that the Employing Company or any of the Affiliated Companies may have against Employee. The Parties understand and agree that, if Employee becomes employed by an Affiliated Company after executing this Agreement, then that Affiliated Company shall be the Employing Company for purposes of this Agreement.

"The only claims that are subject to this Agreement are those that are allowed under applicable federal, state, or local law, and are not specifically excluded below ('Arbitrable Claims'). Arbitrable Claims include, but are not limited to: claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims (including, but not limited to, claims of outrage, intentional infliction of emotional distress, negligent hiring, or negligent supervision), even if such torts are currently unforeseeable; … and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance …."

In addition, the arbitration agreement contains a section describing various claims not covered by the agreement. The following provision is one of several describing claims not covered by the arbitration agreement:

"Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency, notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission, the U.S. Department of Labor, the National Labor Relations Board, and any state and local administrative agencies." [Hereafter, the "savings clause."]

3.

On or about April 30, 2016, Peña was transferred to California and, thereafter, was employed by TitleMax until his resignation in July 2018.

## II. Peña Files a Claim Against TitleMax with DLSE

In January 2019, Peña filed a claim against TitleMax with DLSE.[1] In that claim, Peña sought reimbursement for business expenses he allegedly incurred during his employment with TitleMax, and waiting time penalties for wages he allegedly was not timely paid.

DLSE notified TitleMax of the claim on or about February 19, 2019. Notices were sent to the parties on that date, advising them that a conference "to discuss the validity and to settle the claim" was scheduled to occur the following month.

The settlement conference occurred, as scheduled, on March 14, 2019. Both parties participated but no settlement was reached. During the conference, Peña indicated he wanted to add additional claims against TitleMax. Because the matter did not settle, it was "referred to hearing" which we understand to mean a decision was made by DLSE to hold an evidentiary hearing (Berman hearing).[2] TitleMax made no mention of the existence of the arbitration agreement at the March 14, 2019 settlement conference.

---

[1] "An employee (plaintiff) alleging the non-payment of wages or other compensation by his or her employer (defendant), must file a claim (the **DLSE Form 1, 'Initial Report of Claim'** form) with a local office of DLSE to initiate investigation of the claim by the Labor Commissioner." (<https://www.dir.ca.gov/dlse/policies.htm> [as of Mar. 27, 2023].) "Filing of an Initial Report or Claim triggers the Labor Commissioner investigation that Lab[or] C[ode section] 98[, subd.] (a) authorizes." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2022) ¶ 11:1358, p. 11-222.) To our understanding, at no time was Peña independently represented by counsel.

[2] Labor Code section 98 authorizes the Labor Commissioner to investigate, hear, and decide wage claims within the Labor Commissioner's jurisdiction. (*Id.,* at subd. (a).) Evidentiary hearings under Labor Code section 98 are commonly referred to as Berman hearings, named after the sponsor of the authorizing legislation. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1128 (*Sonic II*).)

Nothing significant occurred in connection with the DLSE matter until January 28, 2020, more than ten months after the 2019 settlement conference, when DLSE sent TitleMax a new notice of claim (capitalization omitted). In this new notice of claim, Peña reasserted the claims set forth in his initial claim and added claims for failure to pay overtime wage premiums; failure to compensate for meal periods and rest periods not provided; and failure to pay minimum wages set forth in two counts seeking liquidated damages. Included with the notice of claim was a letter from DLSE indicating the matter would be "set for a formal hearing [i.e., a Berman hearing] pursuant to Section 98 of the California Labor Code." However, no hearing date was set at that time.

On March 3, 2020, DLSE sent the parties a notice of hearing (capitalization omitted) indicating a Berman hearing was scheduled for April 1, 2020. Included with the notice of hearing was a copy of the complaint (capitalization omitted) filed by Peña and dated February 7, 2020. The February 7, 2020 complaint is the earliest filed complaint reflected in the record on appeal.[3] The notice of hearing informed TitleMax of its right to file an answer within ten days of service of the notice of hearing, and that the hearing would go forward regardless of whether TitleMax submitted an answer, or appeared at the hearing, and that an "Order Decision or Award [would] be issued in accordance with the evidence offered at the hearing." The record on appeal does not reflect that TitleMax ever filed an answer to the February 7, 2020, complaint.

On March 13, 2020, and again on March 17, 2020, counsel for TitleMax requested the Berman hearing be postponed due to the worsening Covid-19 outbreak and the travel

---

[3] Whereas the filing of a claim triggers a DLSE investigation (see fn. 1, *ante*), the filing of a complaint triggers DLSE's obligation to "notify the parties as to whether a hearing will be held, whether action will be taken in accordance with [Labor Code] Section 98.3, or whether no further action will be taken on the complaint." (Lab. Code, § 98, subd. (a).) Once a defendant is served with the notice of hearing and complaint, the defendant is permitted (but not required) to "file an answer with [the DLSE] … setting forth the particulars in which the complaint is inaccurate or incomplete and the facts upon which the defendant intends to rely." (*Id.,* at subd. (c).)

bans that had issued. TitleMax proposed the hearing be rescheduled to June 1, 2020. On March 17, 2020, DLSE postponed the Berman hearing to an undetermined date. DLSE admits "the postponement was due to the statewide lockdown over concerns of the Covid-19 pandemic." (Unnecessary capitalization omitted.) As explained by DLSE, Governor Newsom declared a state of emergency on March 15, 2020 due to the pandemic; that "[a] series of executive orders restricting all manners of operations followed[]"; that on March 20, 2020, DLSE "postponed all hearings scheduled to be heard over the ensuing weeks"; that, as a result of the pandemic, "business as usual ceased, including all proceedings before [DLSE]";[4] and that "in the fall of 2021, as [the] pandemic subsided, [Peña's] case resumed course."

Thus, approximately 18 months after DLSE had shut down all hearing operations, Peña's matter resumed course. Specifically, on September 10, 2021, Peña filed an amended complaint with DLSE which set forth the same claims he had raised in his amended wage claim. In addition, the amended complaint named Tracy Young, Chief Executive Officer of TitleMax's parent company, TMX Finance LLC, as an additional defendant in the matter. On September 14, 2021, DLSE sent the parties notice that a telephonic Berman hearing would be held on October 27, 2021.

On or about September 30, 2021, TitleMax filed an answer to Peña's amended complaint. On or about October 6, 2021, Mr. Young filed his answer. Neither answer made mention of the arbitration agreement.

According to the declaration of Deputy Labor Commissioner Kathleen Salzer, "[o]n October 18, 2021, the Labor Commissioner began receiving batches of evidence from [TitleMax and Young] for the upcoming hearing." TitleMax submitted additional

---

[4] During this cessation period, DLSE "continued to process incoming wage claims[ but] none were adjudicated until hearings resumed—remotely—many months later."

6.

evidence to DLSE over the next several days. In addition, TitleMax provided DLSE with hearing appearance sheets to identify its counsel and intended witnesses.

Also during this period, on October 21, 2021, counsel for TitleMax requested DLSE convert the Berman hearing to a settlement conference "in order to enforce the settlement agreement that the parties had agreed to" which, according to TitleMax's counsel, was "confirmed multiple times, by … Peña, on the phone." TitleMax's counsel indicated, "[w]ith the Labor Commissioner's guidance, that settlement can be finalized and, in light of these circumstances, it would be a waste of time, money, and resources for all parties and for the Labor Commissioner to both prepare for and conduct a [Berman] hearing on October 27 (instead of a settlement conference to finalize the deal). This proposal would allow all parties to conduct a settlement conference with the assistance of your office, and if and only if that fails, to spend considerable time, money, and resources for a hearing."

On October 22, 2021, TitleMax's counsel sent DLSE an email to follow up on his request to convert the Berman hearing to a settlement conference. Also on that day, TitleMax's counsel emailed DLSE seeking confirmation that DLSE had received TitleMax's exhibits marked "TitleMax 0001 through 0566," advising DLSE that additional defense exhibits would be forthcoming, and noting that TitleMax had not received any exhibits Peña might have submitted to DLSE in advance of the Berman hearing. The email read, in part, "[p]lease let me know if you can provide us copies of these as soon as possible so that TitleMax can exercise its due process rights to review the exhibits in advance of the hearing, which is only a few days away." (Emphasis omitted.)

On October 25, 2021, DLSE received amended hearing appearance sheets from TitleMax identifying its counsel and intended witnesses.

TitleMax did not mention the arbitration agreement in any of the above mentioned communications with DLSE.

7.

The Berman hearing scheduled for October 27, 2021 was converted to a settlement conference. The conference was held but was unsuccessful. DLSE advised it would notify the parties of a new hearing date. The following day, October 28, 2021, DLSE sent an email to TitleMax's counsel indicating that a future Berman hearing would be conducted by video. However, no Berman hearing was scheduled at that time.

On November 15, 2021, Peña provided DLSE his evidence in support of his claims. However, there is no evidence in the record that Peña's evidence was ever provided to TitleMax.

On November 16, 2021, TitleMax sent Peña a letter dated November 15, 2021 demanding he "resolve any and all of [his] claims (including the … pending wage claims) by binding arbitration, pursuant to the [arbitration agreement]." DLSE received a courtesy copy of the letter on November 17, 2021. This letter appears to be the first time TitleMax mentioned the arbitration agreement in connection with the DLSE proceedings and the first indication in the record on appeal that TitleMax intended to assert its right to compel arbitration.

Subsequently, TitleMax notified DLSE that it filed a petition to compel arbitration and provided DLSE with copies of the petition paperwork.

## III. The Trial Court Denies TitleMax's Petition to Compel Arbitration

### A. *TitleMax Moves to Compel Arbitration*

TitleMax filed its petition to compel arbitration of Peña's claim on December 17, 2021. In its petition, TitleMax alleged Peña had filed an administrative complaint against it in January 2019 with DLSE, and had amended his complaint on September 10, 2021 to bring additional claims against it and to add Mr. Young as a defendant. TitleMax alleged it demanded arbitration on November 16, 2021, but Peña failed to respond to the demand and thus refused to arbitrate his claims. TitleMax requested the trial court order Peña to arbitrate all of his claims against TitleMax "including but not limited to those claims currently before [DLSE], while preserving Mr. Young's personal jurisdiction challenge."

8.

In support of its petition, TitleMax authenticated and submitted a copy of the arbitration agreement in addition to other evidence.

### B. The Trial Court Grants DLSE Leave to Intervene

On or about March 3, 2022, DLSE filed an application for leave to intervene in connection with TitleMax's petition to compel arbitration. In its memorandum of points and authorities in support of its application, DLSE contended "[b]ecause [TitleMax] has unreasonably delayed asserting its right to arbitration and fully participated in the administrative adjudicative process to [Peña's] detriment, [TitleMax] has waived its rights under the arbitration agreement and thus cannot deprive [DLSE] of jurisdiction over [Peña's] claims." DLSE argued it has a "right to intervene in 'any proceedings when it appears that [the Labor Commissioner's] jurisdiction is being usurped by an unenforceable arbitration agreement[,]' " quoting *Sonic II*, *supra*, 57 Cal.4th at p. 1149. DLSE also submitted a copy of its proposed opposition to TitleMax's petition.

Peña joined in DLSE's application and its proposed opposition. DLSE contended it has a substantial interest in protecting its jurisdiction and that its "intervention will not expand the issues presented in this case since [its] arguments will not extend beyond the arbitration agreement's enforceability" and that "[t]he arguments made by [DLSE] in opposition to the petition would be the same arguments raised by [Peña]—that his claims pending before [DLSE] are not excluded by the arbitration agreement and that the agreement is unenforceable, and thereby insufficient to remove [Peña's] claim from [DLSE's] jurisdiction. No additional issues will be presented …."[5]

_____

[5] On appeal, TitleMax contends DLSE did not abide by its representation to the trial court that it would limit the issues it would raise in opposition to the petition to compel arbitration, arguing the issue of "waiver" is a new issue. However, TitleMax does not contend it was error for the trial court to consider DLSE's waiver argument and presents no argument to that effect. Arguments presented in passing and without argument or authority are waived. (*Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890; *In re Marriage of Schroder* (1987) 192 Cal.App.3d 1154, 1164.

In support of its application to intervene, DLSE submitted a declaration from Peña in which he indicated he had spoken with TitleMax's attorney "on roughly a dozen occasions with the expectation of settling [his] claims, the most recent of which was on October 20, 2021." Peña averred TitleMax's counsel stated, "Even if you win with the Labor Board, [TitleMax] is willing to spend any money necessary to ensure that we win the case. We don't think you have any merit on what you are asking. We already waited this long, so time is not an issue. Companies have money set aside specifically for these types of legal matters, so cost is not an issue." Peña stated he was not surprised by these comments because, "on April 18, 2020, in an earlier telephone conversation, [TitleMax's counsel] told me that: 'We will delay this case by any means necessary.' " Peña also stated, "Many of my encounters with [TitleMax's counsel] included discussions regarding the merits of my case. I believe this provides Title[M]ax with an unfair advantage over me in the present litigation."[6]

On June 16, 2022, TitleMax filed a reply to DLSE's proposed opposition. TitleMax also submitted a supplemental declaration of its counsel in which counsel averred TitleMax participated in the March 14, 2019, settlement conference in good faith; on March 3, 2020, TitleMax received notice of the Berman hearing scheduled for April 1, 2020, but the hearing was postponed indefinitely due to the Covid-19 pandemic; no litigation activity occurred in connection with the DLSE proceedings until about one and a half years later when TitleMax received a copy of Peña's amended complaint; and, in the intervening period, TitleMax and Peña "had, on multiple occasions, tentatively agreed to a settlement amount, but [Peña] changed his mind each time before a settlement

_____

[6] DLSE argues TitleMax's failure to address Peña's declaration on appeal "effectively waives issues and arguments" asserted on appeal, citing *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887–888. We disagree. Peña's declaration was only filed in connection with DLSE's motion to intervene and not in opposition to TitleMax's petition to compel arbitration. Nothing in the trial court's order denying the petition to compel arbitration suggests the court relied on Peña's declaration.

agreement was executed." Counsel also indicated TitleMax "vehemently denie[d] unreasonably delaying the case in bad faith"; and he "vehemently denie[d] ever uttering, 'We will delay the case by any means necessary,' or '[TitleMax] is willing to spend any money necessary to ensure we win the case.' " Counsel averred "[a]s an Officer of the Court …, [I] ha[ve] never uttered those words in any case, let alone in this case." Counsel further noted the parties, prior to TitleMax's petition to compel arbitration, "did not engage in any motion practice, written discovery, or depositions"; "have not litigated the merits of the dispute"; and "have not exchanged proposed exhibits." Furthermore, counsel averred "TitleMax has not obtained information as to the legal strategies of [Peña]."

On June 21, 2022, DLSE served TitleMax and Mr. Young with a copy of a newly amended complaint dated April 19, 2022, and noticed a Berman hearing for August 2, 2022. The newly amended complaint amended Peña's claim for overtime wages, meal and rest period premium wages, and liquidated damages.[7]

On June 23, 2022, the trial court granted DLSE's motion to intervene and continued the hearing on TitleMax's petition to compel arbitration to July 28, 2022. In its adopted tentative ruling, the court noted that TitleMax did not oppose DLSE's motion

---

[7] In this newly amended complaint dated April 19, 2022, Peña reduced his claim for overtime wages from $34,770.60 to $16,052.85; reduced his claim for meal period premium wages from $5,837.40 to $3,574.35; reduced his claim for rest period premium wages from $5,181.75 to $3,574.35; and reduced his two claims for liquidated damages from $1,128.00 and $10,521.00 to a single amount of $6,072.00. In addition, the alleged periods of time for which Peña claimed he was entitled to recovery were changed. Each claim now sought recovery for the period January 1, 2018 through July 16, 2018 (rather than from February 1, 2017 through February 3, 2018). The remaining claims for unreimbursed business expenses and waiting time penalties were the same in amount as compared to Peña's prior amended complaint but the alleged period of time for which Peña claimed he was entitled to recover for unreimbursed business expenses was changed from January 31, 2017 through July 20, 2018 to February 1, 2017 through January 31, 2018.

to intervene and that TitleMax had "in good faith submitted a reply to the proposed opposition [to the petition to compel arbitration]" but that "the proposed opposition is not filed so it is not presently before the court." The court directed TitleMax to "refile its response to any arguments filed in opposition."

### C. The Trial Court Denies the Petition to Compel Arbitration

On July 6, 2022, DLSE filed its opposition to TitleMax's petition to compel arbitration. DLSE's opposition raised similar points to those raised in its proposed opposition submitted in connection with its application for leave to intervene. DLSE noted that, prior to the hearing on DLSE's application for leave to intervene, DLSE had noticed a new date for the Berman hearing on Peña's newly amended complaint. In addition, DLSE resubmitted the prior declaration of Deputy Labor Commissioner, Kathleen Salzer, in opposition to TitleMax's petition.

On July 21, 2022, TitleMax filed its reply in support of its petition to compel arbitration and a reply declaration from its counsel along the same lines as that which was filed in reply to DLSE's application for leave to intervene and proposed opposition to TitleMax's petition to compel arbitration.

On July 22, 2022, DLSE objected to the trial court considering the reply declaration of TitleMax's counsel, arguing new evidence submitted in reply papers should not be considered. TitleMax replied to the objections noting (1) when it filed its petition to compel, it could not have anticipated DLSE's joinder or arguments in opposition; (2) the declaration responds to new issues raised by DLSE in opposition; and (3) the reply declaration was substantially the same as that which it had filed in reply to DLSE's proposed opposition which gave DLSE an opportunity to address it when it filed its formal opposition.

On July 25, 2022, TitleMax filed an ex parte application to stay the Berman hearing that was scheduled to commence on August 2, 2022, three court days following the hearing on TitleMax's petition to compel arbitration. DLSE opposed the ex parte

12.

application and notified TitleMax that, absent a court ordered stay, the Berman hearing would remain on calendar for August 2, 2022.

On July 28, 2022, the trial court denied TitleMax's petition to compel arbitration and its ex parte application for a stay of the Berman hearing. The court sustained DLSE's objection to the reply declaration of TitleMax's counsel. With regard to its denial of the petition to compel, the trial court found it was undisputed Peña was employed by TitleMax and subject to a "valid agreement to arbitrate wage claims" and determined "[t]he only contested issue [was] whether [TitleMax] waived its right to compel arbitration." Relying on a six factor test set forth in *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes*), the trial court found TitleMax's conduct was "inconsistent with the right to arbitrate and constitute[d] a waiver."

On July 28, 2022, TitleMax timely appealed the trial court's order denying TitleMax's petition to compel arbitration and its order denying a stay of the DLSE proceedings.

## DISCUSSION

### I. This Court Granted TitleMax's Petition for a Writ of Supersedeas to Stay DLSE Proceedings During Pendency of the Appeal

On August 1, 2022, TitleMax filed a petition for writ of supersedeas with this court seeking an immediate, temporary stay of the August 2, 2022, Berman hearing. We granted a temporary stay and subsequently granted the petition "until a determination of the appeal on the merits or further order of this court."

### II. Peña's Claims are Arbitrable Under the Terms of the Arbitration Agreement

In the court below, in addition to arguing TitleMax waived its right to arbitrate Peña's claims, DLSE argued the savings clause permitted Peña to bring his claims before DLSE—i.e., that the arbitration agreement, as applied to Peña's claims, was merely

13.

permissive and not mandatory. We set forth the text of the savings clause again for the reader's convenience.

> "Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency, notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission, the U.S. Department of Labor, the National Labor Relations Board, and any state and local administrative agencies."

The trial court, having found that TitleMax waived its right to arbitrate, did not address DLSE's alternative argument that Peña's claims were not subject to mandatory arbitration in light of the language of the savings clause. On January 4, 2023, we ordered supplemental briefing to determine this threshold issue.

Having reviewed and considered the litigants' supplemental briefing, we conclude Peña's claims are not exempt from the scope of the arbitration agreement and are subject to mandatory arbitration for the reasons set forth below.

### A. *Clauses Similar to the Savings Clause Have Been Held to Save an Arbitration Agreement From Being Declared Invalid Where Applicable Law May Prohibit the Waiver of Access to Administrative Relief*

TitleMax contends the savings clause is "designed most immediately to address NLRB [National Labor Relations Board] rulings under federal labor-relations law." "For decades, the National Labor Relations Board (NLRB) took the position that it is an unfair labor practice for an employer to … require employees to agree to mandatory arbitration of all claims …." (Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶ 18:526.) "The U.S. Supreme Court reversed this policy in *Epic Systems Corp. v. Lewis* (2018) ___ US __, ___, 138 S.Ct. 1612, 1632 …. [¶] However, the NLRB takes the position that an arbitration agreement violates section 8(a)(1) of the NLRA [National Labor Relations Act] if it can be reasonably construed to interfere with an employee's right to file charges with the NLRB." (Chin, et al., Cal. Practice Guide: Employment

14.

Litigation, *supra*, at ¶ 18:526, citing, e.g., *Prime Healthcare Paradise Valley, LLC* (2019) 368 NLRB No. 10.)

TitleMax notes the NLRB has approved " 'virtually identical' " language as an appropriate means to protect an arbitration agreement from potential invalidation on grounds it conflicts with provisions of the NLRA, citing *Uber Technologies, Inc. & Lenza H. Mcelrath III* (2020) 369 NLRB 102. In *Uber Technologies*, the NLRB concluded section 8(a)(1) of the NLRA was not violated by a mandatory arbitration agreement which contained a savings clause that read, "[r]egardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency notwithstanding an agreement to arbitrate. Such administrative claims include without limitation claims or charges brought before … the [NLRB] …." (*Uber Technologies*, at pp. 1, 3–4.)

DLSE acknowledges the NLRB has interpreted provisions substantively identical or similar to the above quoted provision and have "concluded the provision is a savings clause that adequately provides parties access to an agency's administrative process to resolve certain disputes." DLSE argues, however, a similar result should apply here— i.e., that the savings clause should operate to provide access to "state and local administrative agencies" pursuant to the final phrase of the savings clause. In support of its contention, DLSE largely relies on California Labor Code section 229[8] which provides, in relevant part: "Actions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate."

In response, TitleMax contends the FAA preempts section 229 and that "California courts have consistently recognized that, 'if the FAA applies,' the 'statutory claims' under the Labor Code 'may be arbitrated,' [citation], including claims subject to

---

[8] Statutory references are to the Labor Code unless otherwise indicated.

adjudication in a Berman hearing, [citation]." Thus, TitleMax contends the savings clause is not triggered by section 229 because it is not "applicable law."

We conclude TitleMax has the better argument.

***B. The FAA Applies to the Arbitration Agreement and Section 229 Is Preempted by the FAA***

### 1. The FAA Applies to the Arbitration Agreement

The FAA is codified commencing at section 1 of title 9 of the United States Code. The law was passed "to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and to place such agreements ' "upon the same footing as other contracts …." [Citation.]' [Citation.] The federal statute rests on the authority of Congress to enact substantive rules under the commerce clause, requiring courts to enforce arbitration agreements in contracts involving interstate commerce." (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 383 (*Cronus*).)

Here, the arbitration agreement expressly provides, "[t]he Federal Arbitration Act (9 U.S.C. §§ 1–16) ('FAA') shall govern this Agreement. If for any reason the FAA does not apply, then the state law of arbitrability where Employee works for the Employing Company (or, if Employee is no longer employed by the Employing Company, last worked for the Employing Company) shall apply." The arbitration agreement further provides, "[t]he Parties understand and agree that the Employing Company is engaged in transactions involving interstate commerce and that this Agreement relates to transactions in interstate commerce. Specifically, the parties agree that the Employing Company markets and sells products and provides services to customers which involve the movement of money, automobiles, and automobile titles from state to state." Peña does not dispute that TitleMax's business involved interstate commerce. Moreover, DLSE

acknowledges that, unless the savings clause takes the arbitration agreement out of the FAA, "the FAA controls …."[9]

Based on the foregoing, we conclude TitleMax has successfully demonstrated the FAA applies to the arbitration agreement. For reasons discussed in a subsequent section of this opinion, we reject DLSE's contention that the savings clause takes the arbitration agreement out of the FAA.

### 2. Section 229 Is Preempted by the FAA

The FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." (*Perry v. Thomas* (1987) 482 U.S. 483, 490 [107 S.Ct. 2520, 96 L.Ed.2d 426] (*Perry*).) "[T]he FAA 'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.' [Citation.] The policy of enforceability established by section 2 of the FAA is binding on state courts as well as federal courts." (*Cronus*, *supra*, 35 Cal.4th at p. 384.)

Section 2 of the FAA provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract …." (9 U.S.C.A § 2.) "[F]ederal policy places [section 2 of the FAA] in unmistakable conflict with California's [section] 229 requirement that litigants be provided a judicial forum for

---

[9] DLSE argues that "[t]he question here is whether or not the [savings] [c]lause takes the [arbitration] [a]greement out of the FAA for purposes of arbitrating … Peña's wage claims. *If not, the FAA controls* and [DLSE's] initial analysis applies: [TitleMax] waived its rights to arbitrate those claims as determined by the [trial court]." (Italics added.)

17.

resolving wage disputes. Therefore, under the Supremacy Clause, the state statute must give way." (*Perry*, *supra*, 482 U.S. at p. 491; *Performance Team Freight Systems, Inc. v. Aleman* (2015) 241 Cal.App.4th 1233, 1239-1240 (*Performance Team*) ["[I]n most cases, the FAA mandates arbitration when contracts involving interstate commerce contain arbitration provisions. [Citations.] In matters in which the FAA applies, it preempts Labor Code section 229, requiring arbitration of claims that otherwise could be resolved in court."].)

In its supplemental reply brief, DLSE argues for the first time that Peña did not sign the arbitration agreement until 2014 and that, because our state courts did not recognize the preemption until 2015, citing *Performance Team*, *supra*, 241 Cal.App.4th at p. 1240, the arbitration agreement was not preempted when signed by Peña. The claim that our state courts did not recognize section 229's preemption until 2015 is inapposite. (See, e.g., *Sonic II, supra*, 57 Cal.4th at pp. 1170–1171 [discussing *Perry* at length and holding "the FAA preempts a state-law rule that categorically prohibits an adhesive arbitration agreement from requiring an employee to waive access to a Berman hearing"]; *id.* at 1171 [vacating judgment in *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659 (*Sonic I*) [in which the Court concluded it was unconscionable and contrary to public policy for an employer to require an employee waive its right to a Berman hearing].)

Notwithstanding, assuming for purposes of analysis that *Performance Team* was the first California decision recognizing the FAA preempted section 229, we nonetheless reject DLSE's argument on several grounds. First, the point was not raised until DLSE filed its final supplemental reply briefing and no good cause was shown for as to why it was asserted late. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before." ' "]. Second, "Conflict preemption occurs when ' "[S]tate law is pre-empted to the extent that it actually conflicts with federal law." ' " (*Physicians Committee for Responsible*

18.

*Medicine v. McDonald's Corp.* (2010) 187 Cal.App.4th 554, 565.) Thus, conflict preemption occurs upon the existence of the conflict—not the existence of caselaw recognizing the conflict. Third, DLSE does not provide any authority (and we know of none) that suggests a state court must explicitly recognize U.S. Supreme Court authority before such authority binds the state.

We conclude there is no merit to the contention that the FAA did not preempt section 229 at the time the arbitration agreement was signed.

### 3. Analysis of the Savings Clause

"Interpretation of a contract is a question of law 'when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence.' [Citation.] In addition, courts interpret a contract as a matter of law 'even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.' " (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 818–819.) "Absent any conflict in extrinsic evidence, we review de novo issues regarding the proper interpretation of a contract." (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 915.) Here, there is no conflict in the evidence and we may decide the proper interpretation of the arbitration agreement de novo.

Arbitration agreements are "subject to the same rules of construction as any other contract …." (*Fittante v. Palm Springs Motors, Inc.* (2003) 105 Cal.App.4th 708, 713.) "Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration." (*Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc.* (4th Cir. 2001) 252 F.3d 707, 710.)

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code § 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible …." (*Id*. at § 1639.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (*Id*. at § 1641.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (*Id*. at § 1644.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (*Id*. at § 1647.) "Particular clauses of a contract are subordinate to its general intent." (*Id*. at § 1650.) "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract." (*Id*. at § 1652.) "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." (*Id*. at § 1653.) With these principles in mind, we now turn to the text of the savings clause.

> "Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency, notwithstanding the existence of an agreement to arbitrate. Such administrative claims include, without limitation, claims or charges brought before the Equal Employment Opportunity Commission, the U.S. Department of Labor, the National Labor Relations Board, and any state and local administrative agencies."

According to TitleMax "[t]he operative terms here are sufficiently clear to resolve the inquiry on their face. The term 'applicable' means 'capable of being applied' or 'fit, suitable, or right to be applied.' [Citation.] The term 'law' … refers to 'the whole body of laws relating to one subject.' [Citation.] The FAA is clearly part of the 'body of laws relating' to access to an adjudicatory for[u]m notwithstanding an agreement to arbitrate,

20.

and it is clearly 'capable' or 'fit' 'to be applied,' …." TitleMax argues "[w]here the FAA applies, 'applicable law' does not afford access to an [administrative] agency, notwithstanding an arbitration agreement." (Italics omitted.)

DLSE argues parties are free to structure an arbitration agreement in such a manner as to exclude certain claims from those that are arbitrable under the agreement. DLSE is undoubtedly correct on this point. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (*AT & T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 648 [106 S.Ct. 1415, 1418, 89 L.Ed.2d 648, ___]; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323.)

DLSE contends the savings clause "contemplates control under state law because it says so" and that, once triggered, "the [savings clause] controls and takes the [arbitration agreement] out of the FAA, hence no preemption." DLSE then engages in a lengthy analysis of Peña's claims to demonstrate that they fall within the scope of section 229. Assuming, without deciding, that each of Peña's claims falls within the scope of section 229, we conclude DLSE's argument, nonetheless, fails because the savings clause was not actually triggered in this case.

The first sentence of the savings clause states: "Regardless of any other terms of this Agreement, claims may be brought before and remedies awarded by an administrative agency if applicable law permits access to such an agency, notwithstanding the existence of an agreement to arbitrate." DLSE argues the introductory phrase "Regardless of any other terms of this Agreement" means that once the savings clause is triggered, "none of the other terms of the [arbitration agreement] could apply." DLSE then turns to the second sentence of the savings clause and argues the inclusion of the phrase "any state and local administrative agencies" demonstrates Peña is entitled to have DLSE adjudicate his claims. DLSE argues nothing prohibits an

employer from "allow[ing] a wage claimant access to a Berman hearing and then proceed[ing] to arbitration if either party appeals." (Italics omitted.)

We begin by recognizing that each of Peña's claims appear to fall within the scope of claims generally identified as subject to arbitration. The arbitration agreement provides: "Arbitrable Claims include, but are not limited to: claims for wages or other compensation due … and claims for violations of any federal, state, or other governmental law, statute, regulation, or ordinance (except as otherwise provided below)." The phrase "except as otherwise provided below" refers to the section on "Claims Not Covered by the Agreement" of which the savings clause is a part.

The litigants disagree as to whether the savings clause was triggered; we conclude it was not. The triggering language that allows a party to bring claims before an administrative agency reads "if applicable law permits access to such an agency, notwithstanding the existence of an agreement to arbitrate." We agree with TitleMax that "applicable law" includes the FAA. Because the FAA preempts section 229, section 229 is not "applicable." Nothing in the language of the savings clause suggests the parties intended a two-tier system whereby a Berman hearing is first allowed and then arbitration is only available should a party decide to appeal.

To the extent DLSE is arguing the savings clause completely eliminates the need to arbitrate Peña's claims because the second sentence of the savings clause includes the phrase "any state and local administrative agencies," several comments are in order. In our view, the second sentence of the savings clause is intended to merely provide exemplars of agencies that, *under certain circumstances*, are appropriate adjudicatory fora—i.e., when applicable law allows them to serve as fora despite the existence of an agreement to arbitrate. To allow the second sentence of the savings clause to operate independent of the first sentence would be to render the first sentence mere surplusage. That the first sentence limits the second is supported by the first few words of the second sentence which, in referencing the first sentence, begins "Such claims include …."

22.

Moreover, the phrase "any state and local administrative agencies" remains relevant in the event a court were to find the FAA did not apply. This was an identified concern in the second paragraph of the arbitration agreement in which it states, "If for any reason the FAA does not apply, then the state law of arbitrability where Employee works … shall apply." Were this court to have concluded the FAA did not apply, then section 229 would have constituted "applicable law" and would have permitted access to the DLSE "notwithstanding the existence of an agreement to arbitrate."

Based on the foregoing, we conclude Peña's claims are subject to mandatory arbitration and may not be adjudicated by DLSE unless TitleMax waived its right to compel arbitration. As discussed below, we conclude TitleMax did not waive its right to compel arbitration.

## III.     Standard of Review on the Issue of Waiver

"A right to compel arbitration may be waived." (*Davis v. Continental Airlines, Inc.* (1997) 59 Cal.App.4th 205, 211 (*Davis*).) Code of Civil Procedure section 1281.2 provides, in pertinent part: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, *unless it determines* that: [¶] (a) *The right to compel arbitration has been waived by the petitioner* …." (Code Civ. Proc., § 1281.2, subd. (a), italics added.) Here, the trial court based its order denying TitleMax's petition to compel arbitration on its determination that TitleMax had waived its right to compel arbitration.

DLSE contends this court should review the trial court's order denying TitleMax's petition to compel arbitration for substantial evidence, and the order must be upheld because it is supported by substantial evidence. TitleMax acknowledges waiver determinations typically involve questions of fact but where " 'the facts are undisputed

and only one inference may reasonably be drawn' " a question of law is presented. Impliedly, TitleMax contends this court may decide the waiver issue de novo.

"There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed." (*Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 279, internal quotation marks omitted.)

"[A]lthough the burden of proof is heavy on the party seeking to establish waiver, which should not lightly be inferred in light of public policy favoring arbitration, a determination by a trial court that the right to compel arbitration has been waived ordinarily involves a question of fact, which is binding on the appellate court if supported by substantial evidence. The appellate court may not reverse the trial court's finding of waiver unless the record as a matter of law compels finding nonwaiver." (*Davis*, *supra*, 59 Cal.App.4th at p. 211.)

Moreover, "[i]f more than one reasonable inference may be drawn from undisputed facts, the substantial evidence rule requires indulging the inferences favorable to the trial court's judgment." (*Davis, supra,* 59 Cal.App.4th at p. 211.) " 'When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.' " (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.)

Here, the salient facts are undisputed[10] and our review is de novo.

---

[10] DLSE contends the facts are not undisputed, arguing there is a dispute as to whether TitleMax "engaged in 'good-faith' settlement efforts." However, DLSE also acknowledges that those disputes are not relevant, and that it is TitleMax's "inaction that is at issue here." We agree with this latter statement. Moreover, the only evidence of TitleMax's good faith, or lack thereof, is contained in declarations that were either not submitted in opposition to the petition to compel arbitration (i.e., Peña's declaration in

## III. Factors Considered in Determining Whether a Waiver Has Occurred

" ' "[W]aiver" means the intentional relinquishment or abandonment of a known right.' [Citations.] Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.' [Citation.] ' "Waiver always rests upon intent." ' [Citation.] The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475 (*Lynch*).)

### A. California Law

In *St. Agnes*, the California Supreme Court adopted the six factor test relied upon by the trial court in denying TitleMax's petition to compel arbitration, as follows: " 'In determining waiver, a court can consider "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled, or prejudiced' the opposing party." ' " (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.)

"There is no single test for the type of conduct which may waive arbitration rights, but the conduct must have caused prejudice to the opposing party. The California Supreme Court has summarized: 'We have stressed the significance of the presence or

---

support of DLSE's motion to intervene) and the reply declaration of TitleMax's counsel which was rejected by the trial court on DLSE's objection. Thus, TitleMax's good faith was not before the court or considered by it. (See fn. 6, *ante*.)

25.

absence of prejudice. Waiver does not occur by mere participation in litigation; there must be "judicial litigation of the merits of arbitrable issues," ... although "waiver could occur prior to a judgment on the merits if prejudice could be demonstrated" .... This result is fully consistent with federal cases which have held that "as an abstract exercise in logic it may appear that it is inconsistent for a party to participate in a lawsuit for breach of a contract, and later to ask the court to stay that litigation pending arbitration. Yet the law is clear that such participation, standing alone, does not constitute a waiver, for there is an overriding federal policy favoring arbitration .... [M]ere delay in seeking a stay of the proceedings without some resultant prejudice to a party ... cannot carry the day." ' " (*Groom v. Health Net* (2000) 82 Cal.App.4th 1189, 1194 (*Groom*), italics omitted.)

However, in *Burton v. Cruise* (2010) 190 Cal.App.4th 939 (*Burton*), the Fourth District Court of Appeal concluded *Groom* "erred in failing to recognize that a petitioning party's conduct in stretching out the litigation process itself may cause prejudice by depriving the other party of the advantages of arbitration as an 'expedient, efficient and cost-effective method to resolve disputes.' " (*Burton*, at p. 948, quoting *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 996 (*Sobremonte*).) "Arbitration loses much, if not all, of its value if undue time and money is lost in the litigation process preceding a last-minute petition to compel." (*Burton*, at p. 948.)

The *Burton* court noted, "[i]n *St. Agnes*, the Supreme Court cited both *Groom* and *Sobremonte* as opposite extremes of the same continuum for finding prejudice. [Citation.] But, as *St. Agnes* recognized, the critical factor in demonstrating prejudice is whether the party opposing arbitration has been substantially deprived of the advantages of arbitration as a ' " 'speedy and relatively inexpensive' " ' means of dispute resolution. [Citation.] 'Rather, courts assess prejudice with the recognition that California's arbitration statutes reflect " 'a strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution' " and are intended " 'to

26.

encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' " ' " (*Burton*, *supra*, 190 Cal.App.4th at p. 948.)

" ' "California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration [citations] to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. [Citations.] The decisions likewise hold that the 'bad faith' or 'willful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration. [Citation.]" [Citation.] The fact that the party petitioning for arbitration has participated in litigation, short of a determination on the merits, does not by itself constitute a waiver.' " (*Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 661 (*Khalatian*); accord, *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 374–375 (*Iskanian*), abrogated on other grounds in *Viking River Cruises, Inc. v. Moriana* (2022) ____ U.S. ____ [142 S.Ct. 1906, 213 L.Ed.2d 179].)

### B.     *Under the FAA, Prejudice Is Not Required for a Finding of Waiver*

"In California, whether or not litigation results in prejudice … is critical in waiver determinations." (*St. Agnes*, *supra*, 31 Cal.4th at p. 1203.) However, DLSE notes that the U.S. Supreme Court has recently rejected "prejudice" as a special requirement in order to find waiver under the FAA. (*Morgan v. Sundance, Inc.* (2022) ___ U.S. ___ [142 S.Ct 1708, 1712, 212 L.Ed.2d 753] (*Morgan*).) The *Morgan* court stated, "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." (*Id.* at p. 1713.) "If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." (*Ibid.*)

27.

DLSE contends "*Morgan* does not state that prejudice can no longer be considered; it remains a factor. However prejudice is not a requirement to find waiver." We agree that *Morgan* stands for the proposition that prejudice is not a requirement to find waiver under the FAA.

With these state and federal principles in mind, we address the considerations for waiver of an arbitration agreement identified in *St. Agnes*. (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.)

## IV.  TitleMax's Limited Participation in DLSE Proceedings Was Not Inconsistent With Its Right to Arbitrate

On appeal, TitleMax contends it "took no action inconsistent with the right to arbitrate"; ninety percent of the delay experienced between Peña's initial filing of his wage claim in January 2017, and TitleMax's demand for arbitration in November 2021, was caused by a combination of the "Covid-19 pandemic, unexplained administrative delay, or failure of prosecution on … Peña's part"; and the "the remaining time period was subsumed with bona fide settlement discussions that, as a matter of law, cannot form the basis of waiver." (Italics omitted.)

TitleMax argues the superior court relied on TitleMax's "inaction" rather than on actions inconsistent with the right to arbitrate in denying its petition to compel arbitration. Although the court posited that the delay in the DLSE proceedings due to the Covid-19 pandemic "did not impede [TitleMax's] ability to demand arbitration…," TitleMax argues it "had no reason to demand arbitration" when the DLSE process "was stalled … through no fault of TitleMax's." It argues "[o]nly 'the *unreasonable* and *unjustified* conduct of the party seeking arbitration' can be deemed inconsistent with the right to arbitrate," citing *Iskanian*, *supra*, 59 Cal.4th at p. 377.) TitleMax argues there was no *conduct* on its part inconsistent with the right to arbitrate and that its inaction was both reasonable and justified.

28.

### A. TitleMax's Participation in Settlement Negotiations Was Not Inconsistent With Its Right to Compel Arbitration

TitleMax contends its participation in settlement negotiations was not an act inconsistent with it right to compel arbitration. We agree.

DLSE argues that TitleMax's "settlement efforts were fully acknowledged, but were not relevant to the court's analysis and final determination." However, the trial court did, in fact, consider and base its decision, in part, on TitleMax's participation in the settlement conferences with DLSE. The court, in referring to TitleMax's participation in settlement conferences, wrote, "the evidence shows that [TitleMax] utilized DLSE's process for a significant amount of time to do so. Rather than object to the process in favor of arbitration, [TitleMax] participated in two settlement conferences in an attempt to resolve the dispute. At the latter settlement conference, [TitleMax] sought DLSE's guidance to finalize a settlement." In the penultimate paragraph of its adopted tentative ruling, the court cites TitleMax's participation in the DLSE settlement conferences as one of two pieces of evidence to show TitleMax "fully engaged the DLSE process."[11] Thus, it appears the court considered and relied on TitleMax's participation in the DLSE settlement conferences as a basis to find waiver. Similarly, DLSE relies on TitleMax's participation in those settlement conferences to argue that TitleMax fully engaged in the limited processes available to it in connection with the DLSE proceedings.

TitleMax cites to several cases to support its contention that participation in settlement efforts is not inconsistent with the right to compel arbitration. We examine those authorities below.

---

[11] The other piece of evidence relied on by the trial court to demonstrate TitleMax's "full[] engage[ment] in the DLSE process," was TitleMax's "exchanging evidence in preparation for hearing." We address that issue in a subsequent section of this opinion.

In *Dickinson v. Heinold Securities, Inc.* (7th Cir. 1981) 661 F.2d 638 (*Dickinson*), the plaintiff held an account with the "defendant's stock options brokerage service." (*Id.* at 639.) By agreement, the defendant had "limited discretionary power to trade plaintiff's account" and the plaintiff, believing the defendant exceeded its authority, complained to the Chicago Board Options Exchange (CBOE). (*Id.* at p. 640.) The CBOE investigated for more than a year and, when the plaintiff threatened to sue, the defendant demanded arbitration pursuant to the parties' agreement. (*Ibid.*) The plaintiff did not respond so the defendant commenced arbitration with the CBOE. (*Ibid.*) Despite this, the plaintiff filed suit in U.S. District Court and defendant answered, asserting in its answer the matter should be arbitrated. (*Ibid.*) For more than a year, the parties engaged in discovery and in attempts to settle the dispute before the defendant eventually moved to compel arbitration. (*Id.* at pp. 640–641.)

The plaintiff argued the defendant's conduct waived the right to compel arbitration and that it took the defendant "18 months after the controversy arose to seek arbitration." (*Dickinson*, *supra*, 661 F.2d at p. 641.) In concluding the defendant did not waive its right to compel arbitration, the court wrote, "when [the] plaintiff indicated that an informal resolution would no longer be possible, [the defendant] promptly moved for arbitration. Preliminary negotiations concerning a settlement are not sufficient to waive arbitration. [Citation.] Significant periods of delay prior to the onset of litigation are often necessary to allow the parties to engage in good faith efforts to resolve the controversy without reference to an adjudicatory body. Neither the length of the delay nor the interim actions of [the defendant] were inconsistent with [the defendant's] arbitration right."[12] (*Ibid.*)

---

[12] The *Dickinson* court also found the defendant's participation in discovery was reasonable and justified due to questions surrounding whether certain claims were arbitrable. (*Dickinson*, *supra*, 661 F.2d at pp. 641–642.)

In *Walker v. J.C. Bradford & Co.* (5th Cir. 1991) 938 F.2d 575 (*Walker*), the defendant waited 13 months after the plaintiffs filed suit to move to compel arbitration. (*Id*. at 576.) During that period, the plaintiff answered the complaint and served preliminary interrogatories and document requests on the plaintiff. (*Ibid*.) The plaintiff produced documents but did not answer interrogatories. (*Ibid*.) Subsequently, the defendant moved to compel arbitration but the court denied the motion finding that "by using the court's judicial resources and processes," the defendant had waived its right to arbitrate. (*Ibid*.) On appeal, the *Walker* court reversed and ordered the trial court to refer the matter to arbitration. (*Id*. at p. 579.) In doing so, the *Walker* court rejected the trial court's reasoning that "attempts at settlement [were] evidence of pre-trial activity supporting a finding of waiver." (*Id*. at p. 578.) The court wrote "[a]ttempts at settlement, … , are not inconsistent with an inclination to arbitrate and do not preclude the exercise of a right to arbitration." (*Ibid*.)

In *Zamora v. Leman* (2010) 186 Cal.App.4th 1 (*Zamora*), a defendant who had demurred to the plaintiff's complaint, participated in limited discovery, and during the pendency of the case attempted to settle, thereafter sought to compel arbitration. (*Id*. at pp. 9, 19–20.) In upholding the trial court's decision to refer the matter to arbitration, the appellate court wrote, "[the defendant's] attempt to settle the action was not inconsistent with the right to arbitrate and did not result in undue delay." (*Id*. at p. 20.) Quoting *Walker*, the *Zamora* court wrote, " 'Offers to settle, like arbitration, are to be favored, as they encourage the amicable and quick settlement of suits outside the judicial system.' " (*Ibid*., quoting *Walker*, *supra*, 938 F.2d at p. 578, and citing *Dickinson*, *supra*, 661 F.2d at p. 641.) Notably, the policy in favor of settlement is also reflected in many of our statutes. (E.g., Fam. Code, § 271 [discussing "the policy of the law to promote settlement of litigation"]; Code Civ. Proc., § 877 [discharging settling tortfeasor's liability for contribution to other parties in connection with good faith settlement]; Evid. Code,

§§ 1152 & 1154 [inadmissibility of settlement offers to prove liability or invalidity of claim].)

DLSE argues *Walker* and *Zamora* are inapposite because the trial court did not rely on TitleMax's participation in settlement processes to support its ruling. As discussed above, we have concluded the trial court, at least in part, relied on such participation in finding TitleMax had waived its right to appeal. DLSE also argues that in *Walker*, the appellate court found that the defendant's participation in the litigation was minimal. However, we note that the *Walker* defendant's participation in the litigation was arguably greater than that in the instant case. In *Walker*, not only did the defendant answer the plaintiff's complaint but it also served written discovery (i.e., interrogatories and document requests), received documents in response to the discovery, and participated in at least one pretrial conference. (*Walker*, *supra*, 938 F.2d at p. 576.)[13]

We address the extent of TitleMax's participation in other DLSE processes below. However, in terms of TitleMax's engagement in settlement activity, we find the reasoning in *Walker*, *Dickinson*, and *Zamora* persuasive. Participation in settlement proceedings, as a general matter, is not inconsistent with the right to compel arbitration of a dispute and, like arbitration, is favored in our judicial system.

---

[13] DLSE argues there is no evidence that TitleMax engaged in "*bona fide* settlement discussions." (Emphasis in original.) We disagree. The declaration of Deputy Labor Commissioner Salzer authenticated communications between TitleMax's counsel and DLSE which include TitleMax's representations that the parties were close to settlement on more than one occasion. DLSE is authorized to postpone Berman hearings "if the Labor Commissioner finds that it would lead to an equitable and just resolution of the dispute." (§ 98, subd. (a).) The fact that DLSE agreed to convert the October 27, 2021, Berman hearing to a second settlement conference suggests TitleMax was participating itself in good faith and does not lend itself to a contrary inference. See also, footnote 10, *ante*.

***B.  TitleMax's Participation In The DLSE Proceedings Was De Minimis and Insufficient to Constitute a Waiver of Its Right to Compel Arbitration***

DLSE notes that TitleMax "makes much of the fact that it filed no demurrers, had not responded to nor objected to discovery, and filed no dispositive motions." DLSE contends this "is of no consequence" since "[n]one of those things are available in Berman proceedings. Rather, the Berman process is a simple one. [Citation.] There are only two pleadings and no discovery." Discovery is only allowed, after a Berman hearing is held, an appeal has been filed, and the trial court grants leave to conduct discovery. Thus, DLSE contends TitleMax "made full use of [DLSE's] process" by attending the settlement conferences (including "utilizing DLSE's guidance" and "exploit[ing DLSE's] expertise" in seeking settlement), filing an answer, exchanging evidence, and seeking continuances.

We decline to view the lack (or minimum availability) of processes through DLSE as a factor weighing in favor of a finding of waiver. With regard to DLSE's specific contentions, we have already addressed TitleMax's participation in settlement discussions and have concluded such participation is not inconsistent with a right to arbitrate. As to the contention TitleMax sought a continuance in March 2020 at the outset of the pandemic, we note the continuance sought was of limited duration and was, within a few days, made moot by the fact that DLSE continued all hearings almost contemporaneously with TitleMax's request and did not resume hearings for another 18 months—all through no fault of TitleMax. Moreover, Deputy Labor Commissioner Salzer admitted "the postponement was due to the statewide lockdown over concerns of the Covid-19 pandemic." (Unnecessary capitalization omitted.)

We also reject the contention that TitleMax "exploited [DLSE's] expertise." DLSE does not explain this contention and the only evidence on the subject is in DLSE's proffered declarations which read, in relevant part: "Once enough information is obtained from the complainant, … a conference is scheduled whereby the parties, with

33.

assistance from the Deputy Labor Commissioner, can attempt to resolve the claim. That was done in this case as well[]"; DLSE "discussed the claim process with both parties" during the settlement conferences; and "[t]he October 27, 2021 hearing was converted to a settlement conference. It was unsuccessful …." The assistance of a deputy labor commissioner in settlement talks is part of the settlement conference process. Again, we do not view attempts at settlement as inconsistent with the right to arbitrate.

We acknowledge, however, that the filing of an answer without invocation of the right to arbitrate may be said to be inconsistent with a right to arbitrate. Yet, cases have noted such conduct alone is insufficient to constitute a waiver. (*Gloster v. Sonic Automotive, Inc*. (2014) 226 Cal.App.4th 438, 449 (*Gloster*) ["Answering a complaint and participating in litigation, on their own, do not waive the right to arbitrate."]; *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1205 (*Hoover*) ["A defendant answering the complaint does not per se waive the right to demand arbitration later."]; *Khalatian*, *supra*, 237 Cal.App.4th at p. 662 ["Answering a complaint does not result in waiver."]; *Consolidated Brokers Ins. Services, Inc. v. Pan-American Assur. Co., Inc.* (D. Kansas 2006) 427 F.Supp.2d 1074, 1079 [no waiver where defendant sought leave to amend answer relatively early in litigation to allege arbitration agreement].)

Moreover, the following facts militate against finding the mere filing of an answer as supportive of a finding of waiver: (1) the answer was filed with DLSE on or about September 30, 2021; (2) no Berman hearing was held, it having been instead converted to a settlement conference; and (3) when that settlement conference (held on October 27, 2021) proved unsuccessful, Titlemax demanded arbitration only two and half weeks later (i.e., by November 16, 2021) and only one and a half months after TitleMax actually filed its answer with DLSE.

34.

## V.     TitleMax Did Not Substantially Invoke the Litigation Process

As mentioned, DLSE acknowledges that its processes are relatively minimal. TitleMax contends, "an invocation [of the litigation machinery] must be substantial, not 'limited,' and intervening steps must be important, not nominal," citing *Aronow v. Superior Court* (2022) 76 Cal.App.5th 865, 885 (*Aronow*), and that " 'mere participation in litigation' is not enough," citing *St. Agnes*, *supra*, 31 Cal.4th at p. 1203.  TitleMax argues the facts are insufficient to demonstrate the substantial invocation of litigation machinery.  We agree.

DLSE contends that *Aronow* is inapposite because the court was merely stating that certain types of collateral discovery will not place a party at risk of waiving its right to arbitration.  In *Aronow*, the defendant desired to conduct discovery of the plaintiff's finances to challenge the plaintiff's in forma pauperis status. (*Aronow*, *supra*, 76 Cal.App.5th at p. 884.)  DLSE contends the discovery at issue here was not collateral.  But TitleMax notes, "[n]o evidence was actually exchanged between the parties, and this is in all events precisely the 'de minimis' involvement in litigation that cannot plausibly support a waiver finding."  In fact, there is no evidence in the record that any evidence submitted by Peña to DLSE was ever provided to TitleMax or that the documents TitleMax provided DLSE were ever provided to Peña.  Moreover, if any of the evidence submitted by TitleMax to DLSE was communicated or provided to Peña, it would only have redounded to Peña's benefit.

TitleMax contends participation in settlement discussions does not qualify as a substantial invocation of the litigation machinery, and that to hold otherwise "would achieve the bizarre result of disincentivizing future litigants from utilizing that process to achieve settlement."  We agree with both points for the reasons discussed above.

TitleMax argues the filing of an answer is also not a sufficient invocation of the litigation machinery to constitute a waiver.  Again, we agree.  "Answering a complaint and participating in litigation, on their own, do not waive the right to arbitrate."  (*Gloster*,

*supra*, 226 Cal.App.4th at p. 449; *Hoover*, *supra*, 206 Cal.App.4th at p. 1205 ["A defendant answering the complaint does not per se waive the right to demand arbitration later."].)

Based on the above, we conclude that TitleMax did not substantially invoke the litigation machinery in a manner that would weigh in favor of a finding of waiver.

## VI. TitleMax's Request for Arbitration Was Sufficiently Timely

Another factor related to waiver is "whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay." (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196). When DLSE first scheduled a settlement conference between the parties, no formal complaint was on file with DLSE and no Berman hearing had been set. No adjudicative process had been commenced and TitleMax was neither required nor authorized to file an answer at that time. (§ 98, subd. (c).)

In *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.* (5th Cir. 1970) 427 F.2d 924 (*General Guaranty*), the parties had entered into an agency agreement which included an arbitration provision. (*Id.* at p. 926.) A dispute arose in 1964 but no suit had been filed and neither party demanded arbitration. (*Ibid.*) Ten months later, the plaintiff filed suit. (*Ibid.*) The defendant moved for summary judgment on grounds the agreement had been abandoned and superseded by a new agreement releasing the defendant from all obligations and liability. (*Ibid.*) The defendant requested that "only in the event" the court found the original agreement operative, then it should refer the matter to arbitration. (*Ibid.*)

The trial court denied the motion in its entirety and determined a trial on the issue of whether the first agreement was abandoned was necessary. (*General Guaranty*, *supra*, 427 F.2d at p. 927.) In 1968, trial on the abandonment issue was held. (*Ibid.*) The court found the first agreement (containing the arbitration provision) had not been abandoned but declined to refer the matter to arbitration because, among other things, the defendant

36.

"failed to ask for arbitration before suit was filed"; "allowed [the] plaintiff to proceed with taking depositions in Florida before indicating any intent to request arbitration"; and only requested arbitration "in the alternative." (*Id*. at pp. 927–928.)

In concluding the defendant had not waived its right to seek arbitration, the *General Guaranty* court wrote, "[r]equiring pre-suit demand will place on the party sought to be charged the duty to institute proceedings which may establish his own liability, though if he remains inactive the claims asserted against him may never be formally pressed in either arbitration or court proceedings (and in some instances may be wholly without merit)." (*Id*. at p. 928.)

Here, in its subject order, the trial court determined *General Guaranty*'s "holding has no application here, where a claim was filed and pending since January 7, 2019." We disagree. Requiring TitleMax to demand arbitration before an actual complaint had been filed with DLSE, and before any Berman hearing was scheduled, would have placed TitleMax in the position of instituting proceedings while it was still uncertain whether Peña's claims would ever be formally pressed.

Then, once a formal complaint was filed on February 7, 2020, and the matter was first set for a Berman hearing in March 2020, it was soon taken off calendar due to the pandemic through no fault of TitleMax and the case was dormant for the next 18 months.

When DLSE resumed hearing cases, it served TitleMax with a newly filed amended complaint on September 10, 2021, which added a new party defendant, Tracy Young. A Berman hearing was scheduled for October 27, 2021. On or about September 30, 2021, TitleMax did file an answer but was successful in convincing DLSE to convert the hearing to a settlement conference. We conclude TitleMax's request to convert the hearing to a settlement conference was justified and reasonable given that no proceedings before DLSE had occurred in the preceding 18 months and DLSE presumably felt the request was justified. (See fn. 13, *ante*.)

When the October 27, 2021, settlement conference proved unsuccessful, TitleMax demanded arbitration less than a month later on November 16, 2021, and less than two months after it had filed its initial answer in the matter. No further Berman hearing had yet been scheduled. We conclude TitleMax's demand for arbitration was sufficiently timely.

## VII. No Counterclaims Were Filed By TitleMax

The fourth factor set forth in *St. Agnes* is "whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings." (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.) The trial court noted this factor is "inapplicable." We agree and conclude the factor does not weigh in favor of a finding of waiver.

## VIII. No Important Intervening Steps Had Taken Place

The fifth factor set forth in *St. Agnes* is " 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place.' " (*St. Agnes*, *supra*, 31 Cal.4th at p. 1196.) Here, DLSE notes that discovery is not available in Berman proceedings. Moreover, we have mentioned the fact that TitleMax provided numerous exhibits to DLSE but there is no evidence that TitleMax ever received any evidence that Peña may have submitted to support his claim. DLSE further notes that the Berman process is a simple one involving "only two pleadings and no discovery." In light of this, we conclude the evidence does not support a finding that important intervening steps had taken place, weighing against a finding of waiver.

## IX. Peña Was Not Prejudiced

Finally, although not required to find waiver, we fail to appreciate any prejudice suffered by Peña as a result of TitleMax's actions. As we have discussed, to the extent there was delay in the DLSE proceedings, by and large those delays were not caused by TitleMax. The slight delay that was caused by TitleMax (i.e., requesting the October 27,

38.

2021, hearing be converted to a settlement conference) was reasonable and justified. TitleMax demanded arbitration the very next month.

The fact that TitleMax provided DLSE with evidence in advance of the October 27, 2021, hearing before it was converted to a settlement conference did not operate to Peña's prejudice. There is no evidence that TitleMax's documentary submissions were thereafter communicated or provided to Peña—but, if they were, this would have only inured to Peña's benefit and not his detriment. Peña was not prejudiced in that regard.

Moreover, although Peña's declaration in support of DLSE's motion to intervene does not appear to have been considered by the trial court, we note that the only prejudice identified by Peña is that "[m]any of [his] encounters with [TitleMax's attorney] included discussions regarding the merits of [his] case" and that he "believe[s] this provides Titlemax with an unfair advantage over [him] in the present litigation." From Peña's declaration it is clear that these "encounters" were limited to either the two settlement conferences scheduled by DLSE or in telephone calls and email exchanges outside the DLSE process. We have already concluded that participation in settlement conferences is an insufficient basis upon which to premise a finding of waiver. Moreover, participation in settlement conferences invariably involves a discussion of the merits of claims in dispute. This is not a basis for finding waiver.

## X.     Summary

Peña's claims are subject to mandatory arbitration. Although it may be the better practice for a party to assert the right to arbitrate promptly after being notified of an adverse claim, the facts of this case do not warrant a finding that TitleMax waived its right to compel arbitration.

The delays in proceeding to a Berman hearing were not due to any unreasonable or unjustified conduct by TitleMax. Although Peña's claim was filed in January 2019, it was not noticed for a Berman hearing until March 2020. Less than two weeks later,

39.

DLSE took the hearing off calendar due to the Covid-19 pandemic and the case went dormant for another 18 months. None of this was Titlemax's fault. Moreover, the failure to invoke arbitration during that period does not weigh in favor of a finding of waiver for the reasons discussed above.

When the Berman hearing was rescheduled for October 27, 2021, the matter was converted to a settlement conference which we have determined was both reasonable and justified. When that proved unsuccessful, TitleMax demanded arbitration less than a month later, on November 16, 2021. We have concluded this demand was sufficiently timely.

The fact that TitleMax filed an answer a month and a half prior to the October 27, 2021, settlement conference and delivered documents to DLSE during that period did not cause unjustified delay or prejudice, did not substantially invoke the litigation machinery, and was not an important intervening step in the process justifying a finding of waiver.

Based on all of the foregoing factors, we conclude TitleMax did not waive its right to compel arbitration in this matter.

## XI. TitleMax's Remaining Challenge Is Moot

On appeal, TitleMax also challenges the trial court's evidentiary ruling in which it sustained DLSE's objection to the reply declaration of TitleMax's attorney. Because we have concluded reversal is required, we need not consider this argument on appeal.

### DISPOSITION

The trial court's orders denying TitleMax's petition to compel arbitration and denying TitleMax's ex parte application to stay the DLSE proceedings are reversed. The cause is remanded to the trial court with directions to enter a new order referring the

matter to arbitration and staying the DLSE proceedings pending completion of arbitration.  In the interests of justice, each party shall bear its own costs on appeal.


                                                                    SNAUFFER, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.